# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **EDWARD B. BOYD,** | ) | Civil Action No. 1:06cv00095 |
| **Administrator of the Estate of** | ) | |
| **RUSSELL DAVID BOYD,** | ) | **REPORT AND** |
| **Plaintiff,** | ) | **RECOMMENDATION** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DOUGLAS W. GREEN, M.D., and** | ) | By: Pamela Meade Sargent |
| **DRS. GREEN, P.C.,** | ) | United States Magistrate Judge |
| **Defendants.** | ) | |

Plaintiff, Edward B. Boyd, brought this action as the administrator of the estate of Russell David Boyd against defendant, Dr. Douglas W. Green, M.D., ("Dr. Green"), for the wrongful death of Russell Boyd, which allegedly was caused by medical treatment rendered or not rendered by Dr. Green. On February 28, 2007, this court granted Edward Boyd's motion to add an additional defendant in this case, Drs. Green, P.C., ("the Practice"), (Docket Item No. 19), and, as a result, an amended complaint was filed on March 8, 2007, (Docket Item No. 20), ("Complaint"). This matter is currently before the court on the defendants' Motions to Dismiss the case for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), (Docket Item Nos. 3 and 21), ("Motions"), filed by special appearance on December 15, 2006, and March 8, 2007, respectively. An evidentiary hearing on these Motions was scheduled to be held before the undersigned magistrate judge on April 24, 2007; however, by agreement of the parties, this hearing was canceled, and the Motions were submitted to the court on written argument and evidentiary submissions. (Docket Item No. 30.) As a result, the plaintiff filed written argument and presented evidence on

Case 1:06-cv-00095-GMW-PMS   Document 43   Filed 06/08/07   Page 1 of 44   Pageid#: 666

May 1, 2007, May 10, 2007, and May 24, 2007, (Docket Item Nos. 35, 38 and 41).[1] The defendants filed written argument and presented evidence on April 19, 2007, April 26, 2007, and May 14, 2007, (Docket Item Nos. 28, 33 and 39). Incorporated by reference to the defendants' written argument were two prior briefs filed on December 15, 2006, and January 19, 2006, on behalf of Dr. Green in support of his motion to dismiss, (Docket Item Nos. 4 and 11.) This court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The Motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the court's August 29, 2006, Standing Order, the undersigned now submits the following report and recommended disposition.

## II. Facts

The plaintiff, Edward B. Boyd, is the properly qualified administrator of the estate of Russell Boyd and is a resident of the Commonwealth of Virginia. The deceased, Russell Boyd, also was a resident of the Commonwealth of Virginia at all times relevant to this case. Defendant, Dr. Green, was, at all times relevant to this case, a resident of the State of Tennessee and was licensed to practice medicine only in the State of Tennessee. (Deposition Of Douglass Woodson Green, M.D., (Docket

---

[1] It should be noted that the evidence proffered to the court by the plaintiff, (Docket Item No. 35, Exhibits A-F, and Docket Item No. 38), which were presented as exhibits to the Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss the Amended Complaint, (Docket Item No. 35), ("Plaintiff's Brief"), have not been properly authenticated before this court. These third-party documents have not been made a part of any deposition or affidavit before this court, and no other effort has been made to demonstrate that these documents are authentic. The court has accepted the plaintiff's assertion that these unauthenticated documents are what they purport to be, and has reviewed the contents of these unauthenticated materials. After a thorough review, the court notes that none of these unauthenticated materials are dispositive of any issue in this case.

-2-

Item No. 33), ("Dr. Green Deposition"), at 4-5, 7-9).[2]  Additionally, at all times relevant to this case, Dr. Green maintained his medical office in Bristol, Tennessee, and was employed by the Practice.  (Dr. Green Deposition at 4,7-9.)  The Practice, the other defendant, was, at all times relevant to this case, a Tennessee professional corporation established and incorporated under the laws of the State of Tennessee with a principal place of business in Tennessee.  (Dr. Green Deposition at 7-9.)

This case stems from Russell Boyd's death in Virginia on September 14, 2005. (Complaint at 1, 4.)  Edward Boyd alleges that this death was wrongful and was caused by the "treatment rendered or not rendered" to Russell Boyd by Dr. Green. (Complaint at 2.)  The plaintiff asserts that the  cause of death provided by the Medical Examiner of the Commonwealth of Virginia was mixed drug toxicity. (Complaint at 5.)  Allegedly, at the time of Russell Boyd's death, the Medical Examiner found alprazolam, hydrocodone, hydromorphone and oxycodone in his body.  (Complaint at 4.)  All of these were medications that the plaintiff alleges Dr. Green prescribed to Russell Boyd at some point during his treatment.  (Complaint at 5.)

Dr. Green first treated Russell Boyd in July 1989 pursuant to a referral from the Bristol Regional Medical Center in Bristol, Tennessee.  (Dr. Green Deposition at 50.) Russell Boyd was referred to Dr. Green at this time because Dr. Green was a nephrologist and Russell Boyd was experiencing kidney-related problems.  (Dr. Green Deposition at 50-51.)  Dr. Green treated Russell Boyd until 1993, solely for kidney-related issues.  (Dr. Green Deposition at 51.)  During the course of this treatment, Dr.

---

[2]Dr. Green testified that the proper spelling of his first name is "Douglass."

Green did not prescribe any pain medication, and all medical treatment of Russell Boyd occurred in Tennessee. (Dr. Green Deposition at 51-52.)

Four and a half years later, in May 1998, Russell Boyd returned to Dr. Green's care and, at this point, Dr. Green began to treat Russell Boyd's back pain. (Dr. Green Deposition at 52.) During this second course of treatment, Dr. Green again saw Russell Boyd exclusively at his office with the Practice in Bristol, Tennessee. (Dr. Green Deposition at 52.) Additionally, Dr. Green testified that at no time did he travel to Virginia for the purpose of treating Russell Boyd, and at no time did he have any conversations in Virginia with any of Russell Boyd's family members. (Dr. Green Deposition at 52.) Dr. Green's treatment of Russell Boyd continued until Russell Boyd's death on September 14, 2005. (Affidavit Of Dr. Douglas Green, M.D., (Attachment No. 1 to Docket Item No. 4), ("Dr. Green Affidavit"), at 2.)

Dr. Green stated that, during the course of Russell Boyd's second stint as a patient, Russell Boyd telephoned Dr. Green's office in Tennessee on seven occasions. (Dr. Green Deposition at 52-54; Dr. Green Affidavit at 2.) Based on Dr. Green's testimony, six of these phone calls were to request antibiotics and cough medicine. (Dr. Green Deposition at 52-53; Dr. Green Affidavit at 2.) The seventh call was to request an office visit with Dr. Green at his office in Tennessee. (Dr. Green Deposition at 54; Dr. Green Affidavit at 2.) This call was placed on May 26, 1998. (Dr. Green Affidavit at 2.) The other six telephone calls placed to Dr. Green's office were on August 20, 1999, September 7, 1999, December 2, 1999, December 27, 1999, February 13, 2003, and July 25, 2003. (Dr. Green Affidavit at 2.) As a result of these calls, and pursuant to Dr. Green's instruction, a member of the Practice's staff called

-4-

in prescriptions for Russell Boyd to the Medical Mall Pharmacy at the Bristol Regional Medical Center in Bristol, Tennessee. (Dr. Green Deposition at 52-53; Dr. Green Affidavit at 2.) However, Dr. Green testified that, pursuant to federal law, it is not possible to call controlled medications in to a pharmacy, instead handwritten prescriptions were provided to Russell Boyd in Tennessee for any pain medications. (Dr. Green Deposition at 39-40, 53-54.)

Dr. Green never has practiced medicine in Virginia and has not been licensed to practice in Virginia for more than 20 years. (Dr. Green Deposition at 7, 9, 48.) As a result, he does not have any privileges to practice at any Virginia medical facility, and his medical practice is wholly contained to the State of Tennessee. (Dr. Green Deposition at 7, 35; Dr. Green Affidavit at 1-2.) Dr. Green is currently an employee and shareholder of the Practice. (Dr. Green Deposition at 16.) He began working for the Practice in 1984. (Dr. Green Deposition at 6.) Dr. Green is not an officer of the Practice and never has been an officer of the Practice. (Dr. Green Deposition at 30, 47.) As an employee of the Practice, Dr. Green does not receive any payment directly from any Virginia patient, Virginia insurance provider or Virginia Medicaid program, and all payments go directly to the corporation. (Dr. Green Deposition at 50.)

Dr. Green does not own any property in Virginia, he maintains no bank accounts in Virginia, he does not personally advertise in Virginia, he does not solicit business in Virginia, he does not conduct business in Virginia, he does not treat patients in Virginia, and he is not personally listed in a Virginia phonebook. (Dr. Green Deposition at 47-49; Dr. Green Affidavit at 1-2.) Dr. Green testified that, of the 1,252 patients he had seen in the previous two years, roughly 647 were from

Virginia.  (Dr. Green Deposition at 24-25.)  He further stated that he had personally received referrals from other doctors in Virginia; however, there is no evidence before the court that any of these referrals were in any way initiated by Dr. Green.  (Dr. Green Deposition at 23.)  In fact, Dr. Green testified that the number of referrals he received from Virginia-based physicians had decreased in recent years along with the number of his Virginia patients in general because another nephrologist started a practice in Lebanon and then in Abingdon, Virginia.  (Dr. Green Deposition at 24.)

Dr. Green testified that he occasionally takes personal shopping trips to the Bristol Mall in Bristol, Virginia.  (Dr. Green Deposition at 21.)  Dr. Green stated that he has a personal e-mail account at his home in Tennessee with America Online and internet service through Charter Communications.  (Dr. Green Deposition at 69.)  Through this e-mail address, Dr. Green reported that he occasionally receives e-mails from a dialysis company.  (Dr. Green Deposition at 69.)  However, there has been no evidence presented that Dr. Green's personal e-mail activities establish any relationship with the Commonwealth of Virginia.

Dr. Green has a Virginia Medicaid number, and the Practice treats Virginia Medicaid patients.  (Defendants' Reply To Plaintiff's Memorandum In Opposition To Defendants' Motion To Dismiss The Amended Complaint, (Docket Item No. 39), ("Defendants' Final Brief"), at 6; Dr. Green Deposition at 30-31; Deposition of Donna T. Ostermeyer, (Attachment Nos. 7 and 8 to Docket Item No. 33), ("Ostermeyer Deposition"), at 17-18.)  The testimony of Dr. Green and Donna Ostermeyer, the Practice's office manager, indicates that Dr. Green appears to have applied for a Virginia Medicaid number so that the Practice could receive compensation for Dr.

-6-

Green treating Virginia Medicaid recipients. (Dr. Green Deposition at 30-32; Ostermeyer Deposition at 17-21.) On this issue, Ostermeyer testified that it was the corporation's general practice to require all new doctors that came to work for the Practice to apply for a Virginia Medicaid number. (Ostermeyer Deposition at 18.) She indicated that, to the best of her recollection, when a new physician was hired, she would call Virginia Medicaid or Medallion and they would supply a form to be completed to apply for a Virginia Medicaid number. (Ostermeyer Deposition at 18-19.) Ostermeyer did not indicate whether Dr. Green personally completed this form, whether the application process was considered a personal application by the applying doctor or whether it was part of a group registration.

With respect to Medicaid patients, Dr. Green testified that any payments made by Virginia Medicaid are directed to the Practice, not to him individually. (Dr. Green Deposition at 50.) Furthermore, Dr. Green testified that the Practice does not make any money from the treatment of these patients. (Dr. Green Deposition at 32.) Dr. Green stated that the reimbursement from Virginia Medicaid is "significantly less than the cost of doing business," and the Practice's treatment of Medicaid patients is done as a public service to the community. (Dr. Green Deposition at 32.)

As mentioned above, the Practice is organized as a Tennessee professional corporation. (Dr. Green Deposition at 16.) The Practice was originally established as a partnership by Dr. Green's father and uncle in 1957. (Dr. Green Deposition at 8.) The partnership was converted into a Tennessee professional corporation in 1977. (Dr. Green Deposition at 8.) The Practice has been one of the largest physician groups in the area for 50 years. (Dr. Green Deposition at 42.) Currently, the Practice is

located in Bristol, Tennessee, and the Practice has never been located in Virginia. (Dr. Green Deposition at 9; Ostermeyer Deposition at 9.) In its present location, the Practice's office is approximately one to one and a half miles from the Virginia/Tennessee border, (Dr. Green Deposition at 36), less than 50 miles from the North Carolina/Tennessee border and less than 80 miles from the Kentucky border. As a result, Ostermeyer testified that the Practice has treated patients from "all states" including Virginia, Tennessee, North Carolina and Kentucky. (Ostermeyer Deposition at 25.) No evidence was provided regarding the specific breakdown of the Practice's patients by location. However, Dr. Green testified that the percentage of the Practice's Virginia patients is approximately the same as the percentage of his Tennessee patients. (Dr. Green Deposition at 26.) Thus, approximately 50 percent of the Practice's patients come from Virginia. (Dr. Green Deposition at 26.)

Currently employed as physicians by the Practice are Dr. Douglass Green, Dr. Tom Green, the older brother of the defendant, Dr. John Green, another older brother of the defendant, Dr. Elvira Loria, Dr. Jean Mancini and Dr. Kelly Harris. (Dr. Green Deposition at 9-10.) All of these doctors reside in Tennessee. (Ostermeyer Deposition at 38.) Of these physicians, only one, Dr. Elvira Loria, is licensed to practice medicine in the Commonwealth of Virginia. (Dr. Green Deposition at 35; Ostermeyer Deposition at 32-33.) Currently, Dr. Loria treats three patients at a dialysis center in Abingdon, Virginia. (Ostermeyer Deposition at 53-55.) These three patients were originally treated in the Practice's Bristol, Tennessee office. (Ostermeyer Deposition at 53, 55-56.) Based on Ostermeyer's testimony, it is unclear whether these patients were recipients of a Virginia-based health insurance plan or Virginia Medicaid; however, it appears that they were Virginia Medicaid patients.

-8-

(Ostermeyer Deposition 53, 55-56.) It is clear that the Practice was informed that, in order for these patients to continue to receive coverage for their dialysis treatment, the treatment had to be performed at a Virginia dialysis center. (Ostermeyer Deposition at 53-56.) As a result, Dr. Loria became licensed to practice medicine in Virginia in order to continue to treat these patients. (Ostermeyer Deposition at 53, 56.) Dr. Loria's treatment of these patients requires her to travel "at least once a month" to treat these patients in Virginia. (Ostermeyer Deposition at 53.) However, Ostermeyer testified that, in the previous year, Dr. Loria has treated these patients in Virginia approximately only eight times due to a billing dispute with these patients' payor. (Ostermeyer Deposition at 53-56.) These three are the only patients that Dr. Loria has ever seen in Virginia on behalf of the Practice. (Ostermeyer Deposition at 55.)

The Practice does not directly negotiate contracts with insurance companies. (Ostermeyer Deposition at 11-12, 58.) Instead, the Practice has entered into an agreement with Highlands Physicians, Inc., ("Highlands"), which also is a Tennessee Corporation. (Ostermeyer Deposition at 11-13, 58.) Highlands is an independent practice association which serves both physicians and other healthcare providers. (Plaintiff's Memorandum In Opposition To Defendants' Motion To Dismiss The Amended Complaint, (Docket Item No. 35), ("Plaintiff's Brief"), Exhibit E at 1-2.) Highlands serves healthcare providers in Southwest Virginia and in Northeast Tennessee. (Plaintiff's Brief, Exhibit E at 2.) Some of the services provided by Highlands include recruiting of physicians and other healthcare providers to the network, contracting with healthcare providers, payors, managing contracts on behalf of healthcare providers and providing network management. (Plaintiff's Brief, Exhibit E at 2.) In its role as an independent practice association, Highlands

negotiates contracts with various insurance companies and other payors. (Ostermeyer Deposition at 13, 58; Plaintiff's Brief, Exhibit E at 2.) However, participating provider physicians who have contracts with Highlands are not required to contract with any of the insurance companies with whom Highlands has a contract. (Ostermeyer Deposition at 16, 58-59; Plaintiff's Brief, Exhibit E at 2.)

The Practice receives a list from Highlands of insurance companies or other payors with whom Highlands has a contract, and the Practice then decides whether it wants to "participate" with a particular payor. (Ostermeyer Deposition at 16, 58-59.) However, Ostermeyer testified that the Practice elects to participate in only about 50 percent of the plans with which Highlands has a contract. (Ostermeyer Deposition at 58-59.)

The actual contract entered into between Highlands and the Practice has not been submitted as evidence in this case. Instead, the plaintiff has submitted a copy of an exemplar contract from Highlands, which it currently uses with new member physicians or physician groups. (Plaintiff's Brief, Exhibit A.) This exemplar contract states that "Highlands shall . . . market, advertise and actively promote Highlands; and . . . solicit Payor Agreements from Payors offering reasonable levels of reimbursement and Plans that may include financial incentives or other programs to encourage Eligible Persons to use Participating Providers." (Plaintiff's Brief, Exhibit A at 4.) Additionally, the exemplar contract states that the "Provider shall assist Highlands in marketing, advertising and promotion. Highlands shall use its best efforts to furnish Provider with appropriate materials to support such efforts." (Plaintiff's Brief, Exhibit A at 5.) While this exemplar contract does contain provisions regarding advertising

-10-

on the part of Highlands, this court has no evidence before it that the contract entered into by the Practice and Highlands contained this language. Furthermore, no evidence has been presented that the Practice or Highlands actually engaged in any marketing or advertising.

The evidence presented in this case indicates that Highlands has entered into contracts with several national insurance companies such as Anthem Insurance Companies, Inc., ("Anthem"), Aetna, Inc. and Cigna Corporation, which have numerous insurance plans nationwide. (Ostermeyer Deposition at 11-13, 15, 20; Plaintiff's Brief, Exhibit D; Plaintiff's Supplemental Exhibit In Support Of Its Memorandum In Opposition To Defendants' Motion To Dismiss The Amended Complaint, (Docket Item No. 38), ("Plaintiff's Brief Supplement")). However, there has been no evidence presented that Highlands solicited the contract with Anthem or that Highlands has solicited a contract with any other payor. Furthermore, there has been no evidence presented that any individual member physician or physician group directs the activities of Highlands.

With respect to Highlands's contract with Anthem, the evidence demonstrates that every year Anthem is provided a list of all of the physicians and physician groups that have elected to participate in Highlands's contract with Anthem. (Plaintiff's Brief Supplement.) The Practice, as a group, has chosen to participate in Highlands's contract with Anthem. (Dr. Green Deposition at 27; Ostermeyer Deposition at 11-12, 15-16; Plaintiff's Brief, Exhibit D.) Through this association, it appears that the Practice and Dr. Green, individually, were included on the list provided by Highlands to Anthem and, thus, in Anthem's list of providers. (Plaintiff's Brief Supplement.)

Case 1:06-cv-00095-GMW-PMS   Document 43   Filed 06/08/07   Page 11 of 44   Pageid#: 676

Through the Practice's participation in Highlands's contract with Anthem, the Practice is able to receive reimbursement from various Anthem health plans, including Anthem health plans based in Virginia. (Ostermeyer Deposition at 11-12, 41-42, 50-53; Plaintiff's Brief, Exhibit D; Plaintiff's Brief Supplement.) Additionally, Ostermeyer testified that, recently, bills for patients with an Anthem health plan from Virginia could either be sent to Anthem's Virginia or Anthem's Tennessee office, but, previously these bills were sent to Virginia. (Ostermeyer Deposition at 50-52, 56-57.)

The Practice does treat patients from Virginia, and the Practice accepts payment for treating Virginia patients at it office in Bristol, Tennessee, from Virginia-based payors. (Dr. Green Deposition at 50; Ostermeyer Deposition at 35, 41-42.) The Practice also receives payment from Virginia Medicaid and Virginia Medallion for treatment of Virginia patients. (Dr. Green Deposition at 50; Ostermeyer Deposition at 35, 41-42, 50-53.) However, bills for these Virginia Medicaid patients are actually sent first to a Medicare office in Tennessee which pays the primary amount of the bill, and any remaining amount is sent to Medicaid of Virginia for payment. (Ostermeyer Deposition at 51-53.) When asked about the number of patients covered by Virginia insurance plans, Ostermeyer stated that she did not know the number of patients insured by Anthem Virginia, but the number was "not necessarily" large and that it had been decreasing. (Ostermeyer Deposition at 36.) She also stated that "maybe five percent" of their patients were covered by Virginia Medicaid or Virginia Medallion programs. (Ostermeyer Deposition at 61.)

Patients, including Virginia patients, are drawn to the Practice through several routes, including word of mouth, physician/emergency room referral, insurance

acceptance and the fact that the Practice has been one of the largest physician groups in the area since 1957. (Dr. Green Deposition at 22-23, 42; Ostermeyer Deposition at 14-15, 49-50.) Ostermeyer testified that she had no idea what percentage of patients arrived at the Practice by any of these methods, but she did indicate that the Practice felt that word of mouth was the best way to gain patients. (Ostermeyer Deposition at 28, 50.) Moreover, Dr. Green stated that the Practice "essentially [did] no marketing other than word of mouth." (Dr. Green Deposition at 22.) The Practice does receive patient referrals from Virginia doctors. (Dr. Green Deposition at 23; Ostermeyer Deposition at 40.) Additionally, Highlands has a patient referral network. (Ostermeyer Deposition at 13-14.) However, no evidence has been presented that the Practice received any referral from a Virginia physician through Highlands's referral network, or that any referrals are solicited by the Practice.

The Practice does not advertise for patients. (Dr. Green Deposition at 22-23; Ostermeyer Deposition at 14, 48, 66.) Additionally, it does not make any effort to advertise its practice in Virginia. (Dr. Green Deposition at 22-23, 48-49; Ostermeyer Deposition at 14, 48, 66.) While the practice may be listed in a phone book that serves both Virginia and Tennessee, it does not pay for the advertisement and has not requested this advertisement. (Dr. Green Deposition at 48-49; Ostermeyer Deposition at 28-29, 48.) In fact, the Practice has not paid for any type of telephone book advertisement in more than 15 years. (Ostermeyer Deposition at 28-29, 48.)

Finally, the Practice does have a contract with PIM, a computer programing company located in Abingdon, Virginia, to service the corporation's computers which are used for patient billing. (Ostermeyer Deposition at 42-43.) This service was

-13-

contracted to be performed in Tennessee.  (Ostermeyer Deposition at 42-43.)

## III.  Analysis

Now before the court are the defendants' Motions, brought through a special appearance, which seek dismissal of the plaintiff's complaint based on a lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  When personal jurisdiction is properly challenged under Rule 12(b)(2), the issue is to be decided by the judge "with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence."  *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993) (citations omitted).

In this case, the parties mutually agreed to forgo a formal evidentiary hearing and submit this matter to the court on written argument and evidentiary submissions. The parties also agreed that these submissions be treated as the equivalent of an evidentiary hearing.  Therefore, the plaintiff cannot defeat a motion to dismiss for lack of personal jurisdiction with a mere *prima facia* showing of jurisdiction.  *See Mylan Labs.*, 2 F.3d at 60.  Instead, the plaintiff continues to bear the burden of proving personal jurisdiction over the defendants by a preponderance of the evidence.  *See New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)).

To determine if the plaintiff has met this burden of proof and established that the defendants have sufficient contacts with the Commonwealth of Virginia to subject them to personal jurisdiction in this forum based on diversity of citizenship, the Fourth

-14-

Circuit has employed a two-part test. *See Wolf v. Richmond County Hosp. Auth.*, 745 F.2d 904, 909 (4th Cir. 1984). First, the court must determine whether Virginia law authorizes jurisdiction over the nonresident defendants. *See Wolf*, 745 F.2d 909 (citing *Hardy v. Pioneer Parachute Co.*, 531 F.2d 193, 195 (4th Cir. 1976)). Second, if Virginia law does authorize jurisdiction, the court must determine "whether the exercise of jurisdiction complies with federal constitutional standards of due process." *Wolf*, 745 F.2d at 909 (citing *Hardy*, 531 F.2d at 195).

In this case, the only means by which the plaintiff argues that personal jurisdiction exists in the Commonwealth of Virginia over the defendants is by application of the Virginia long-arm statute, found at Virginia Code § 8.01-328.1(A). Furthermore, the plaintiff has conceded that he is proceeding solely under Virginia Code § 8.01-328.1(A)(4), which provides a court personal jurisdiction over a person,

> who acts directly or by an agent, as to a cause of action arising from the person's . . . [c]ausing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth.

Pursuant to this section, there are three ways in which the plaintiff can establish personal jurisdiction: if the defendants (1) regularly conduct or solicit business in Virginia; (2) engage in any other persistent course of conduct in Virginia; or (3) derive substantial revenue from goods used, goods consumed or services rendered in Virginia. *See* VA. CODE ANN. § 8.01-328.1(A)(4) (2000 & Supp. 2006). Additionally, a defendant's contacts with Virginia must "arise from" the acts giving

-15-

rise to the cause of action in Virginia. *See* VA. CODE ANN. § 8.01-328.1(A) (2000 & Supp. 2006). "[A]rising from" in Virginia Code § 8.01-328.1(A), has been construed to include acts giving rise to the claim and also acts related to the claim itself. *See Prod. Group Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 794-95 (E.D. Va. 2004). If the plaintiff is unable to establish personal jurisdiction over the defendants pursuant to Virginia Code § 8.01-328.1(A)(4), then the analysis stops at this point and this case must be dismissed for lack of personal jurisdiction.

However, if personal jurisdiction can be established under the Virginia long-arm statute, the plaintiff then must establish that jurisdiction is proper under federal constitutional due process standards. *See Wolf*, 745 F.2d at 909 (citing *Hardy*, 531 F.2d at 195). When trying to establish jurisdiction over a defendant who is not present in the forum state, the plaintiff must establish that the defendant has "'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Wolf*, 745 F.2d at 909 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The standard for establishing personal jurisdiction under the due process clause varies depending on the type of contacts the defendant has with the forum state. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003). The Supreme Court has described the two types of personal jurisdiction as specific jurisdiction and general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). Specific jurisdiction arises when the basis of the suit arises from the defendant's contacts with the forum state. *See Helicopteros* 466 U.S. at 414 & n.8; *Carefirst*, 334 F.3d at 397. General

-16-

jurisdiction arises when a defendant's contacts with the forum state do not form the basis of the suit, but instead the defendant has unrelated, general contacts with the forum state that can be characterized as "'continuous and systematic.'" *Carefirst*, 334 F.3d at 397 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002), and citing *Helicopteros* 466 U.S. at 414 & n.9).

Additionally, in this case, the plaintiff's complaint names two distinct defendants, Dr. Green and the Practice. It is clear from plaintiff's complaint that he is suing Dr. Green based on alleged personal actions taken "within the scope of his duties as an employee of [the Practice]. . . ." (Complaint at 4.) The Practice, as organized as a Tennessee professional corporation, is a separate legal entity. "In the typical case, the contacts of a company are not attributed to a corporate agent for jurisdictional purposes." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 177 (4th Cir. 2002) (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)). Instead, "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder*, 465 U.S. at 790 (citing *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)). As a result, the personal jurisdiction analysis for the two defendants in this case requires separate inquiries into the jurisdictional contacts of the two different entities, and this court must determine whether personal jurisdiction exists separately over each defendant.

*A. Personal Jurisdiction Over Dr. Green*

In this case, the facts do not support a finding that this court has personal jurisdiction over Dr. Green pursuant to Virginia Code § 8.01-328.1(A)(4). Dr. Green is being sued personally based on his own actions as an employee of the Practice.

-17-

(Complaint at 4.)   Therefore, the jurisdictional contacts of the Practice cannot be imputed to Dr. Green as a mere employee of the corporation, a fact the plaintiff fails to recognize.  *See Calder*, 465 U.S. at 790; *ePlus Tech.*, 313 F.3d at 177.  Thus, Dr. Green's contacts with the Commonwealth of Virginia alone must be evaluated to determine whether personal jurisdiction exists.  *See Calder*, 465 U.S. at 790; *ePlus Tech.*, 313 F.3d at 177.

All of Dr. Green's specific contacts with Russell Boyd occurred in Tennessee. Any compensation Dr. Green received as a result of this treatment was paid to him by his employer, the Practice.   Dr. Green did not personally telephone any Virginia pharmacy regarding any medication prescribed to Russell Boyd.  However, even if Dr. Green had called prescriptions in to a Virginia pharmacy for Russell Boyd, this would be insufficient to establish a contact with Virginia that would allow personal jurisdiction over Dr. Green.

Prescriptions, either taken from the doctor's office and filled by the patient, or called in to a pharmacy on a patient's behalf, are merely a component of the treatment performed in the doctor's office. A plaintiff cannot use the location where prescriptions are filled as a means to establish personal jurisdiction over the physician in another location when the plaintiff's action is the reason the prescriptions are filled in that location.  *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (stating that a plaintiff cannot create jurisdiction over a defendant based on the plaintiff's unilateral activity; instead, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws").  As a result, none

-18-

of Dr. Green's personal contacts with Russell Boyd resulted in any contact in Virginia. Thus, these contacts do not satisfy the elements of Virginia Code § 8.01-328.1(A)(4).

With respect to Dr. Green's general contacts with the Commonwealth of Virginia, it is clear from the testimony of Dr. Green and Donna Ostermeyer that Dr. Green is not a resident of Virginia, he does not own property in Virginia, he does not treat patients in Virginia, he does not receive compensation from any Virginia insurance companies or providers, he does not solicit business in Virginia and he has not paid for any listing in a Virginia telephone directory. While the evidence presented in this case has established that Dr. Green ventures into Virginia for personal shopping trips, and that he maintains a personal e-mail account through a Virginia-based internet services provider, these contacts with the Commonwealth of Virginia are *de minimus*. As such, these contacts do not form the basis of personal jurisdiction under Virginia Code § 8.01-328.1(A), because they are in no way related to the cause of action at hand. *See Prod. Group Int'l*, 377 F. Supp. 2d at 794-95. While Dr. Green's employer, the Practice, may engage in more extensive dealings in the Commonwealth of Virginia, the corporate structure prevents any such contacts from being imputed to Dr. Green personally, or to Dr. Green in his capacity as an employee. *See Calder*, 465 U.S. at 790; *ePlus Tech.*, 313 F.3d at 177.

Dr. Green is a resident of Tennessee, and his medical practice is wholly contained to Bristol, Tennessee. (Dr. Green Affidavit at 1-2.) Dr. Green is not licensed in Virginia, and he has not practiced in Virginia since graduating from medical school. (Dr. Green Deposition at 7-9, 48.) Dr. Green is a shareholder and employee of a Tennessee professional corporation, the Practice, and Dr. Green has

been sued strictly in his capacity as an employee of the Practice. (Dr. Green Deposition at 16; Complaint at 4.) Dr. Green is not, and has never been, an officer of the Practice. (Dr. Green Deposition at 30, 47.) In his capacity as an employee, Dr. Green performs work for this Tennessee corporation entirely in Tennessee and receives compensation for this work entirely in Tennessee. He receives no direct income from any Virginia patient or Virginia based payor. (Dr. Green Deposition at 50.) The evidence presented establishes that Dr. Green performs no personal advertising of his services into Virginia, and he has no personal contacts with any Virginia insurance companies. Furthermore, the plaintiff has failed to meet his burden of proof to establish that Dr. Green personally participates in any type of referral network or that he personally has any sort of referral arrangement with any Virginia entity. The plaintiff has established nothing more than that Dr. Green has received referrals from Virginia physicians, which could just as easily be the result of a good reputation in his specialty and his longevity in the region as they could be the result of some referral arrangement with a Virginia physician.

The only relevant personal contact Dr. Green has with the Commonwealth of Virginia is that he has a Virginia Medicaid number allowing him to treat Virginia Medicaid and Virginia Medallion patients. (Dr. Green Deposition at 30-31; Ostermeyer Deposition at 17-18.) While Dr. Green has a Virginia Medicaid number, the Plaintiff has failed to clarify whether Dr. Green has an individual Medicaid number or whether that number is part of a group registration. The process that Dr. Green actually underwent to obtain a Virginia Medicaid number was not presented to the court; however, it does not appear that any actions taken by Dr. Green to obtain a Virginia Medicaid number were taken out of his own initiative or for his own

-20-

personal benefit. Instead, it appears that these actions were taken to benefit the Practice at the insistence of the Practice. Furthermore, the application appears to be one singular contact made in the 1980s.

As a result, the only thing the plaintiff has established by a preponderance of the evidence is that Dr. Green has a Virginia Medicaid number. However, merely having a Virginia Medicaid number does not establish that Dr. Green "regularly" conducts or solicits business in Virginia, engages in any other persistent course of conduct in Virginia or derives substantial revenue from goods used, goods consumed or services rendered in Virginia. In fact, the plaintiff specifically has not established that Dr. Green conducts any medical business in Virginia or that Dr. Green derives any revenue from any services rendered in Virginia. None of Dr. Green's patients have been treated in Virginia, and none of the payments for any of Dr. Green's services go to him personally; they go to the Practice.

Furthermore, the plaintiff has not established by a preponderance of the evidence that Dr. Green has engaged in "any other persistent course of conduct" in Virginia. VA. CODE ANN. § 8.01-328.1(A)(4) (2000 & Supp. 2006). This would require a showing that the defendant "[a]t a minimum . . . maintained some sort of ongoing interactions with the forum state." *Willis v. Semmes, Bowen & Semmes*, 441 F. Supp. 1235, 1242 (E.D. Va. 1977). At best, the plaintiff has established that Dr. Green made one contact with the Commonwealth of Virginia in the 1980s to receive a Virginia Medicaid number. The plaintiff has not even clearly established that Dr. Green personally made this contact, or that Dr. Green has had any personal contact with Virginia Medicaid since receiving this number.

Case 1:06-cv-00095-GMW-PMS   Document 43   Filed 06/08/07   Page 21 of 44   Pageid#: 686

As a result, the exercise of personal jurisdiction over Dr. Green under Virginia Code § 8.01-328.1(A)(4), is not valid. Because personal jurisdiction over Dr. Green is not proper under the Virginia long-arm statute, there is no need to examine whether personal jurisdiction exists under the Due Process Clause. Instead, this court finds that the plaintiff has not established personal jurisdiction over Dr. Green by a preponderance of the evidence. Thus, personal jurisdiction is not proper over Dr. Green, and the motion to dismiss should be granted with respect to Dr. Green.

However, even if Dr. Green's single contact with Virginia Medicaid were deemed to satisfy Virginia Code § 8.01-328.1(A)(4), participation in a state's Medicaid programs is not enough, by itself, to establish jurisdiction under the due process clause. *See Wolf*, 745 F.2d at 910-12. *See also Harlow v. Children's Hosp.*, 432 F.3d 50, 66 (1st Cir. 2005); 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3rd ed. 2002). As Dr. Green's Virginia Medicaid number is the only contact with the Commonwealth of Virginia related to Dr. Green's medical practice, the plaintiff has not established any grounds for specific jurisdiction over Dr. Green. The basis of this suit is the wrongful death of Russell Boyd, which allegedly resulted from negligent medical care provided to Russell Boyd in Tennessee by Dr. Green. Russell Boyd was not a recipient of Virginia Medicaid or Virginia Medallion, and these programs played absolutely no role in his treatment by Dr. Green. Therefore, Dr. Green's contacts with Virginia do not "provide the basis for the suit" and, thus, the plaintiff's assertion of specific jurisdiction is not proper in this case. *Carefirst*, 334 F.3d at 397.

Instead, general jurisdiction is the sole means by which the plaintiff can

-22-

establish jurisdiction over Dr. Green. *See Helicopteros,* 466 U.S. at 414-15; *Carefirst,* 334 F.3d at 397. The level of contacts needed to establish general jurisdiction is "significantly higher than for specific jurisdiction." *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623-24 (4th Cir. 1997) (citation omitted). General jurisdiction requires that a defendant's contacts with the forum be "'continuous and systematic.'" *Carefirst*, 334 F.3d at 397 (quoting *ALS Scan*, 293 F.3d at 712, and citing *Helicopteros,* 466 U.S. at 414 & n.9). *See also Wolf,* 745 F.2d at 909. Typically, general jurisdiction requires "substantial forum related activity on the part of the defendant." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3rd ed. 2002). "[T]he defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3rd ed. 2002).

In a situation very similar to the case at hand, the Fourth Circuit, in *Wolf*, found that no general personal jurisdiction in South Carolina existed over a Georgia hospital that received compensation from South Carolina Medicare and Medicaid programs. *See* 745 F.2d at 909-12. In *Wolf*, the Fourth Circuit made explicit findings that a Georgia hospital was authorized to collect Medicaid and Medicare reimbursements for treatment of South Carolina patients. *See* 745 F.2d at 906. The court also found that the hospital received reimbursement from the Aiken County, South Carolina Council for treatment of Aiken County indigent residents, and that the hospital received payment from the State of South Carolina for providing Aiken County

Case 1:06-cv-00095-GMW-PMS   Document 43   Filed 06/08/07   Page 23 of 44   Pageid#: 688

residents maternity and neonatal services. *See Wolf*, 745 F.2d at 906. Thus, the Fourth Circuit stated that the facts presented in *Wolf* established that the hospital treated South Carolina residents and received payment for this treatment either from the state or local governments in South Carolina or from South Carolina residents. *See* 745 F.2d at 910. The amount of income derived from South Carolina residents amounted to 20 percent of the hospital's total income. *See Wolf*, 745 F.2d at 906. Furthermore, it was noted that the South Carolina long-arm statute had consistently been interpreted to provide jurisdiction to the full extent possible under the due process clause of the Fourteenth Amendment. *See Wolf*, 745 F.2d at 909. Despite these findings, the Fourth Circuit found that no personal jurisdiction existed over the Georgia hospital, and that allowing jurisdiction would offend "'traditional notions of fair play and substantial justice.'" *Wolf*, 745 F.2d at 912 (referencing *Int'l Shoe*, 326 U.S. at 316).

Additionally, the First Circuit held that a Massachusetts hospital receiving Medicaid reimbursement from the State of Maine was not enough to establish general personal jurisdiction over the hospital in Maine under the due process clause. *See Harlow*, 432 F.3d at 66. In this case, the First Circuit noted that the Maine long-arm statute extended "'to the fullest extent permitted by the due process clause of the United States Constitution.'" *Harlow*, 432 F.3d at 57 (quoting ME. REV. STAT. ANN. tit. 14, § 704-A(1)). However, the court stated that "[t]reating patients from Maine in Massachusetts, even on a regular basis, is not the same as engaging in continuous and systematic activity in Maine." *Harlow*, 432 F.3d at 66. "That the Hospital derives revenue from treating Maine patients, sometimes in the form of payments from Maine Medicaid, does not alter the basic fact that the Hospital is not 'engaged in continuous

-24-

and systematic activity, unrelated to the suit in [Maine.]'" *Harlow*, 432 F.3d at 66 (quoting *United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088 (1st Cir. 1992)).

The plaintiff would have this court follow the precedent of the Ninth Circuit in *Cubbage v. Merchent*, 744 F.2d 665 (9th Cir. 1984), to establish personal jurisdiction over the defendants in this case. In *Cubbage*, the court found specific personal jurisdiction over Arizona doctors and a hospital who solicited business in California and had "Medi-Cal numbers from the State of California" allowing them to be reimbursed for services rendered to eligible California residents. *See* 744 F.2d at 668. However, *Cubbage* was decided squarely on specific jurisdiction grounds.[3] *See* 744 F.2d at 667-70, 672. Thus, the Ninth Circuit's finding of jurisdiction on this basis is inapplicable to the facts in the case at hand.

With respect to general jurisdiction, the Ninth Circuit found that the defendant doctors and hospital did not have "'continuous and systematic'" contacts with the forum state "sufficient . . . to support general jurisdiction," despite the defendants' possession of California Medicaid numbers and the receipt of payments from California. *Cubbage*, 744 F.2d at 667-68. Thus, the Ninth Circuit specifically held that the defendant doctors could not be subject to general jurisdiction based on

---

[3] With respect to specific jurisdiction, *Cubbage* is not without conflict, even within the Ninth Circuit. *Contra Wright v. Yackley*, 459 F.2d 287 (9th Cir. 1972) (holding that the jurisdictional focus must be on the place where personal services are rendered and on the location of the patient at the time the service is rendered); *Harrison v. Butler*, 131 F.3d 146, 1997 WL 730259 (9th Cir. Nov. 24, 1997) (unpublished opinion) (affirming the district court's finding that an Arizona court did not have personal jurisdiction over a Nevada doctor, relying on *Wright* and distinguishing the case at hand from *Cubbage,* largely because the defendant did not solicit business in Arizona).

Case 1:06-cv-00095-GMW-PMS   Document 43   Filed 06/08/07   Page 25 of 44   PageID#: 690

Medicaid participation and solicitation in the forum state. *See Cubbage*, 744 F.2d at 667-68.

This court finds *Wolf*, *Harlow* and *Cubbage* to be relevant to the case at hand. These cases establish that merely possessing a Virginia Medicaid number does not establish continuous and systematic contact by Dr. Green with the Commonwealth of Virginia. Thus, the plaintiff has failed to prove, by a preponderance of the evidence, that Dr. Green has engaged in significant forum related activity that would establish general personal jurisdiction in Virginia.

## B. Personal Jurisdiction Over the Practice

The court also must determine whether personal jurisdiction exists over the second defendant, the Practice. The first determination that must be made is whether the Practice satisfies the provisions of the Virginia long-arm statute, found at Virginia Code § 8.01-328.1(A)(4), either by regularly conducting or soliciting business in Virginia, by engaging in any other persistent course of conduct in Virginia or by deriving substantial revenue from goods used, goods consumed or services rendered in Virginia.

The plaintiff asserts numerous contacts by the Practice that the plaintiff believes satisfy the long-arm requirements. The first of these contacts is that one of the doctors employed by the Practice is licensed to practice medicine in the Commonwealth of Virginia and does, in fact, treat patients in Virginia. (Dr. Green Deposition at 35; Ostermeyer Deposition at 53.) Dr. Loria, became licensed in Virginia specifically to

-26-

treat three patients. (Ostermeyer Deposition at 53.) These three patients were originally being treated at the Practice's Tennessee office until their insurance provider informed them that they would need to undergo dialysis treatment at a dialysis center located in Abingdon, Virginia, to continue to receive coverage. (Ostermeyer Deposition at 53, 56.) Ostermeyer testified that Dr. Loria was "required at least once a month" to go treat these patients; however, recently, Dr. Loria had been going less frequently due to a billing problem with Medicare. (Ostermeyer Deposition at 53.) As a result, Dr. Loria had been to Virginia to treat these patients only approximately eight times in the past year. (Ostermeyer Deposition at 54.)

It is clear that the Practice is not deriving substantial revenue from treating three patients who appear to be Medicaid and/or Medicare recipients. The evidence indicates that Dr. Green alone has treated over 1,200 patients in the last two years, and the Practice employees five other doctors. As a result, three patients are certainly not a significant portion of the Practice's business. Furthermore, Dr. Green testified that the amount of reimbursement from Virginia Medicaid is "significantly less than the cost of doing business." (Dr. Green Deposition at 32.) Therefore, the plaintiff has not established by a preponderance of the evidence that the Practice is deriving substantial revenue from these three patients being treated in Virginia.

However, it does appear that Dr. Loria's practice in Virginia would qualify under Virginia Code § 8.01-328.1(A)(4), as regularly conducting business in Virginia. "Regularly" is defined as "on a regular basis," "at regular intervals" or "in a regular manner," and "regular" is defined as "recurring, attending, or functioning at fixed or uniform intervals." WEBSTER'S NEW COLLEGIATE DICTIONARY 992 (9th ed. 1990).

-27-

Dr. Loria is "required at least once a month" to treat her three Virginia patients in Virginia and has been doing this for approximately two years. (Ostermeyer Deposition at 53-55.) Therefore, she is treating patients in Virginia at a recurring, regular interval. While she has gone less frequently recently due to a billing problem, she still has treated these patients eight times in the past year. (Ostermeyer Deposition at 54.) Additionally, there is no indication from the evidence before the court that she would not resume her usual monthly treatments of these patients as soon as the billing problem with Medicare was resolved. As a result, this court finds that the Practice, through the activities of Dr. Loria, was regularly conducting business in Virginia.

Additionally, Dr. Loria's contacts surrounding these three patients also may qualify as engaging in an "other persistent course of conduct" in Virginia. VA. CODE ANN. § 8.01-328.1(A)(4) (2000 & Supp. 2006). While this portion of the Virginia long-arm statute is fairly nebulous, it has been read to require the plaintiff to demonstrate "[a]t a minimum . . . that the defendant maintained some sort of ongoing interactions with the forum state." *Willis*, 441 F. Supp. at 1242. In this case, the Practice, through Dr. Loria, has maintained an ongoing interaction with three patients in Virginia. It also has an ongoing relationship with a Virginia dialysis center, through Dr. Loria, which Dr. Loria has used approximately once a month over the past two years to treat Virginia patients. Dr. Loria also has entered into a potentially ongoing relationship with the Virginia Board of Medicine which requires biennial renewal of her Virginia medical license and the completion of prescribed continued competency learning activities. *See* VA. CODE ANN. §§ 54.1-2904, 54.1-2912.1 (2005); 18 VA. ADMIN. CODE §§ 85-20-230, 85-20-235 (2007).

-28-

While there has been no evidence presented that Dr. Loria actually has undertaken any continuing education or made any steps to renew her license, the facts presented do establish that Dr. Loria obtained her Virginia license specifically to treat these three patients, and no evidence has been presented to indicate anything except that she intends to maintain this treatment relationship in Virginia. As a result, through the actions of Dr. Loria, which were taken as an employee of the Practice, and resulted in reimbursements being paid to the Practice, the Practice has engaged in a persistent course of conduct in Virginia subjecting it to jurisdiction under the Virginia long-arm statute.

However, satisfying the Virginia long-arm statute is only the first half of the analysis to determine whether personal jurisdiction is proper over the Practice. The plaintiff also must establish that imposition of personal jurisdiction over the Practice is in compliance with the due process clause. *See Wolf*, 745 F.2d at 909. As was the case with Dr. Green personally, there is no specific jurisdiction over the Practice in this case because the basis of the suit does not arise from the Practice's contacts with Virginia. *See Helicopteros* 466 U.S. at 414 & n.8; *Carefirst*, 334 F.3d at 397.

Russell Boyd's death occurred as a result of allegedly negligent medical treatment in Tennessee. This treatment did not come about through any possible contact of the Practice with the Commonwealth of Virginia. Russell Boyd came to the Practice, Dr. Green specifically, based on a referral from the Bristol Regional Medical Center in Tennessee. Russell Boyd was never treated in Virginia by any employee of the Practice, he was never a Virginia Medicaid recipient, he never had insurance of any sort provided by a Virginia specific insurance carrier, his allegedly negligent

Case 1:06-cv-00095-GMW-PMS   Document 43   Filed 06/08/07   Page 29 of 44   Pageid#: 694

treatment was not related to the Practice's computer contract with PIM and he was not solicited to seek treatment from the Practice by any action of the Practice or Highlands in Virginia. Because the Practice's contacts with the forum do not form the basis of the plaintiff's suit, the only way in which the plaintiff can establish personal jurisdiction over the Practice is through general jurisdiction. *See Helicopteros* 466 U.S. at 414 & n.9; *Carefirst*, 334 F.3d at 397. As a result, the plaintiff's assertion that the Practice is subject to specific jurisdiction is misplaced, and this court will solely address general jurisdiction.

General jurisdiction requires that a defendant's contacts with the forum be "'continuous and systematic.'" *Carefirst*, 334 F.3d at 397 (quoting *ALS Scan*, 293 F.3d at 712, and citing *Helicopteros,* 466 U.S. at 414 & n.9). *See also Wolf,* 745 F.2d at 909. Typically, general jurisdiction requires "substantial forum related activity on the part of the defendant." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3rd ed. 2002). "[T]he defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3rd ed. 2002).

As a result, this court must determine if Dr. Loria's contacts with Virginia are continuous and systematic. As noted above, Dr. Loria's treatment of her three patients in Virginia appears to represent a very small fraction of the Practice's patient load and an even smaller fraction of the Practice's earnings. However, these contacts occur in

-30-

Virginia with a degree of regularity and continuity, as they are "required at least once a month," and they have continued for approximately two years. (Ostermeyer Deposition at 53, 55.) Also, as indicated previously, all payments are directed to the Practice, not individual doctors. (Dr. Green Deposition at 50.) Thus, the actions of Dr. Loria benefit the Practice.

"Continuous" is defined as "marked by uninterrupted extension of space, time or sequence," and "systematic" is defined as "methodical in procedure or plan" or "marked by thoroughness and regularity." WEBSTER'S NEW COLLEGIATE DICTIONARY 284, 1199 (9th ed. 1990). Dr. Loria's contacts appear to be fairly regular and could generally be considered uninterrupted in sequence. While Dr. Loria's contacts are supposed to occur "at least once a month," Ostermeyer testified that recently she has not been making this trip to Virginia every month, and that she has treated these three patients in Virginia only eight times in the past year due to billing problems with the patients' insurance provider. (Ostermeyer Deposition at 53-56.)

As a result, Dr. Loria's contacts have not always been absolutely uninterrupted and regular. However, the evidence suggests that Dr. Loria's contacts prior to the insurance billing problems were uninterrupted and regular. Dialysis requires regular persistent treatment, (Ostermeyer Deposition at 53), and the evidence provides no reason to doubt that once the billing problems are resolved, the frequent treatment of these patients will continue. Additionally, the evidence indicates that, as a result of her treatment of these three patients, Dr. Loria became licensed to practice medicine in Virginia and has continued to do so for approximately two years. Moreover, she has been treating patients regularly in Virginia for these two years even despite billing

-31-

problems. As a result, Dr. Loria's contacts in Virginia on behalf of the Practice appear to be "continuous and systematic."

Additionally, Dr. Loria's contacts are methodical in plan. The evidence demonstrates that Dr. Loria was informed that she would need to treat the three patients at issue in Virginia to continue receiving reimbursement from these patients' insurance providers. As a result, Dr. Loria elected to apply for and become licensed to practice medicine in Virginia. Additionally, she arranged to treat these patients at a dialysis center in Virginia, and proceeded to treat these patients in Virginia for approximately the past two years. Based on the efforts that Dr. Loria had to undertake to continue treating these patients in Virginia, it is clear that her actions were methodical in nature.

Furthermore, Dr. Loria's actions on behalf of the Practice indicate that the Practice has "engaged in longstanding business in the forum state." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3rd ed. 2002). By permitting an employee to become licensed and start practicing across the border in Virginia, and by receiving compensation for this business performed in Virginia, the Practice "purposefully avail[ed] itself of the privilege of conducting activities within [Virginia]." *Hanson*, 357 U.S. at 253. Therefore, the plaintiff has overcome its burden to prove by a preponderance of the evidence that personal jurisdiction is proper over the Practice based on the Practice's contacts in Virginia made by Dr. Loria. The evidence establishes that these contacts indicate that the Practice purposefully availed itself of the forum by Dr. Loria's actions, and establish that subjecting the Practice to jurisdiction in Virginia would not offend "'traditional

-32-

notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (citations omitted).

The court also notes that it has considered the plaintiff's other arguments for personal jurisdiction, but finds that there is no other valid grounds to assert personal jurisdiction over the Practice. In particular, the plaintiff asserts jurisdiction based on various aspects of the Practice's contacts with Highlands. First, the plaintiff asserts that jurisdiction is proper because Highlands performs marketing services and solicits business in Virginia on behalf of the Practice. However, the plaintiff has failed to overcome his burden of proof on this issue. The evidence presented merely establishes that the Practice has a contract with Highlands. The details of that contract have not been submitted or proved. The plaintiff has presented the court with an unsigned contract from Highlands, which is allegedly representative of the contracts that Highlands signs with member physicians. This contract includes some language about marketing, but there is no evidence to establish that the Practice signed a contract with this same language included.

Even the language of the exemplar contract, itself, does not establish that Highlands solicits business on behalf of member physicians. The contract provides that "Highlands shall . . . market, advertise and actively promote *Highlands*; and . . . solicit Payor Agreements." (Plaintiff's Brief, Exhibit A at 4) (emphasis added). Thus, the contract language specifically states that Highlands will market itself. It does not state that Highlands will perform any marketing on behalf of its member physicians. Additionally, the contract states that the "[p]rovider shall assist Highlands in marketing, advertising and promotion." (Plaintiff's Brief, Exhibit A at 5.) However,

-33-

no evidence has been presented that any marketing or solicitation of business was performed by Highlands in Virginia that could be attributable to the Practice, or that the Practice has engaged in any marketing or solicitation to assist in promoting Highlands. As a result, the plaintiff has not established by a preponderance of the evidence that the Practice's contract with Highlands provides for any advertising or solicitation of business in Virginia on behalf of the Practice. The plaintiff also has failed to establish that Highlands or the Practice has actually engaged in any advertising, marketing or solicitation of business in Virginia. Therefore, the plaintiff has not established that the Practice's contract with Highlands provides grounds for personal jurisdiction over the Practice based on the solicitation of business in Virginia.

Second, the plaintiff alleges that the relationship between the Practice and Highlands "directly results in a significant amount of business to the Defendants in Virginia." (Plaintiff's Brief at 7.) This assertion is factually inaccurate. The Practice's business is providing medical care to patients, and the evidence in this case clearly establishes that the Practice does not have a significant amount of business in Virginia. Aside from Dr. Loria's three patients, all of the Practice's business is in Tennessee. Even Dr. Loria's three patients, who are now treated in Virginia, were originally treated in Tennessee. (Ostermeyer Deposition at 53.) The only reason these three patients' treatment moved to Virginia was because of the insistence of their payor. (Ostermeyer Deposition at 53, 56.) Thus, the plaintiff has not proved that any relationship with Highlands "directly resulted" in any business in Virginia.

Third, the plaintiff asserts that Highlands solicited contracts in Virginia on behalf of the Practice. However, the plaintiff also has failed to establish this

solicitation by a preponderance of the evidence. The evidence presented establishes that Highlands negotiates and solicits contracts with payors on its own behalf, in which its member physician groups can elect to participate. However, no evidence has been presented to prove that Highlands actually solicited any contracts in Virginia or that Highlands acts as an agent of the Practice.

The relationship between the Practice, a Tennessee corporation, and Highlands, another Tennessee corporation, is governed by the laws of Tennessee. A central tenet of agency law is that "the principal has the right to control the actions of the agent." *Thomson McKinnon Secs., Inc. v. Moore's Farm Supply, Inc*., 557 F. Supp. 1004, 1011 (W.D. Tenn. 1983). *See also Nidiffer v. Clinchfield R.R. Co.*, 600 S.W.2d 242, 245 (Tenn. Ct. App. 1980) (stating that the "right of control is the primary or the essential test of an agency relationship without which no agency exists"). This element is lacking in the relationship between the Practice and Highlands. No evidence has been presented that the Practice has any type of control over Highlands or has any power to direct Highlands's actions. Instead, the evidence demonstrates that Highlands is an independent corporation that negotiates and solicits contracts with payors for its own benefit. Only the direct actions of a defendant or actions undertaken through an agent on behalf of a defendant can establish personal jurisdiction under Virginia Code § 8.01-328.1(A). As a result, even if Highlands did solicit contracts in Virginia, this action could not subject the Practice to personal jurisdiction in Virginia, because Highlands is not acting as an agent of the Practice.

Fourth, the plaintiff asserts that the Practice is subject to personal jurisdiction in Virginia because it "regularly receives referrals from Virginia physicians of

Virginia patients through a physician referral network." (Plaintiff's Brief at 5.) This assertion also is inaccurate. The evidence presented in this case establishes that the Practice "essentially [does] no marketing other than word of mouth." (Dr. Green Deposition at 22.) Dr. Green stated that he and the Practice receive referrals from Virginia doctors. (Dr. Green Deposition at 23; Ostermeyer Deposition at 40.) Additionally, the evidence establishes that Highlands has a patient referral network. (Ostermeyer Deposition at 13-14.) However, there is no evidence to establish whether the Practice utilizes Highlands's referral network or whether the Practice ever received any referral from a Virginia physician through Highlands's referral network. No evidence establishes that the Practice in any way solicits referrals or that it has any sort of contractual arrangement to receive referrals with any Virginia physician. In fact, the only referral about which any evidence has been provided, was that of Russell Boyd from the Bristol Regional Medical Center, and this occurred entirely in Tennessee.

The evidence establishes that the Practice has been in operation since the 1950s. Additionally, Ostermeyer stated that the way in which the Practice has received patients over the years is through "[r]eferrals from other physicians by word of mouth. The Greens have been there forever." (Ostermeyer Deposition at 14.) As a result, based on the evidence presented, it is just as likely that patients come to the Practice based on the Practice's longevity and reputation in the region. In short, the plaintiff has not proved by a preponderance of the evidence that the Practice receives any Virginia patients through any sort of physician referral network. Furthermore, the referrals that the Practice has received from Virginia physicians do not establish that the Practice is regularly doing or soliciting business in Virginia, engaging in any other

persistent course of conduct in Virginia or deriving substantial revenue from services rendered in Virginia. Thus, the mere fact that the Practice receives referrals from Virginia doctors cannot serve as a basis for personal jurisdiction in Virginia without some sort of action in Virginia on the part of the Practice to obtain these referrals.

Through Highlands, the Practice is provided the opportunity to participate in Highlands's contracts with insurance providers and other payors, some of which have a business presence in Virginia. The plaintiff relies heavily on the relationship between the Practice and Anthem in an attempt to establish jurisdiction. However, the plaintiff fails to recognize that Anthem is a national company with its corporate headquarters in Indianapolis, Indiana. It is not just a Virginia insurance provider. The plaintiff's own evidence indicates that the Practice has participated in Highlands's contract with Anthem, the national entity, not with specific Virginia-based insurance plans affiliated with Anthem. (Plaintiff's Brief, Exhibit D).

Furthermore, the mere fact that a payor is located in Virginia will not establish personal jurisdiction in this case because it cannot survive a due process analysis. *See Helicopteros*, 466 U.S. at 416; *Harlow*, 432 F.3d at 63-66. The recipient of medical services who travels from Virginia into Tennessee to be treated by the Practice will presumably pay for those services. This payment likely will be made by the individual, with a check or a credit card, or payment will be made on the patient's behalf by some other payor. The Supreme Court has held, in discussing contacts that can establish general jurisdiction, that a defendant accepting a check drawn on a forum-based bank is

Case 1:06-cv-00095-GMW-PMS   Document 43   Filed 06/08/07   Page 37 of 44   Pageid#: 702

of negligible significance for purposes of determining whether [the defendant] had sufficient contacts in [the forum]. . . . Common sense and everyday experience suggest that, absent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee and is a matter left to the discretion of the drawer. Such unilateral activity of another party or third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.

*Helicopteros*, 466 U.S. at 416-17 (citations omitted). As the First Circuit held in *Harlow*, the fact that a payor located in the forum paid for the medical services "is not a great deal different" for jurisdictional purposes than if the individual had written a check drawn on a forum-based bank account. 432 F.3d. at 63-64. Thus, the location from which the patient draws the funds to pay for medical care should have no impact on the jurisdictional analysis.

Instead, the fact that the Practice derives revenue from treating Virginia patients, sometimes in the form of compensation from Virginia payors, does not alter the basic fact that the Practice is not engaged in continuous and systematic activity in Virginia unrelated to the suit. *See Harlow*, 432 F.3d at 66. The evidence presented in this case establishes that the Practice's only contacts with any of these payors is placing a bill in the mail and receiving a check in return. With respect to Anthem in particular, Ostermeyer testified that the Practice could mail their Anthem bills either to Anthem's Tennessee office or Anthem's Virginia office. (Ostermeyer Deposition at 50-52, 56-57.)

This same analysis is equally applicable to the Practice's contacts with Virginia Medicaid. The fact that the Practice receives compensation from Virginia Medicaid

-38-

and other Virginia payors, alone, does not establish continuous and systematic activity in Virginia not related to this cause of action. *See Wolf*, 745 F.2d 910-12. *See also Harlow*, 432 F.3d at 66; *Cubbage*, 744 F.2d at 667-68. While an application is necessary to become a Virginia Medicaid or Virginia Medallion provider, the evidence suggests that this application is made one time and, thus, the certification is not continuous or systematic. Furthermore, Ostermeyer testified that Medicare is the primary payor for Virginia Medicaid patients. (Ostermeyer Deposition at 52-53.) As a result, a patient's bill is sent first to a Medicare office in Tennessee and whatever amount is not paid by Medicare is sent as a bill to Virginia Medicaid for payment. (Ostermeyer Deposition at 52-53.) Therefore, it is possible that some Virginia Medicaid patients' bills are never even submitted to Virginia Medicaid.

To obtain general personal jurisdiction, the Practice's contacts with Virginia Medicaid must be "'continuous and systematic.'" *Wolf*, 745 F.2d 909 (citations omitted). Thus, means that "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3rd ed. 2002). Furthermore, the level of contacts needed to establish general jurisdiction is "significantly higher than for specific jurisdiction." *ESAB Group*, 126 F.3d at 623-24.

As a result, the only way in which the Practice's Virginia Medicaid contacts satisfy general personal jurisdiction is through the dealings of Dr. Loria discussed above. By Dr. Loria engaging in longstanding business in Virginia, treating what appear to be three Virginia Medicaid patients, the Practice has engaged in continuous

-39-

and systematic contact with Virginia. However, it is the treatment of these patients in Virginia, not the fact that they are Virginia Medicaid patients, or the fact that any payment was provided to the Practice by Virginia Medicaid, that subjects the Practice to jurisdiction in Virginia.

The plaintiff asserts, as another argument for personal jurisdiction, that the Practice, and Dr. Green, are listed on Anthem's website as a providers. (Plaintiff's Brief at 4-5.) However, this placement was unsolicited. The facts demonstrate that Anthem obtains an annual list of physicians from Highlands and presumably uses that list to create their provider list. There has been no evidence presented that the Practice pays for this listing, that it solicited this placement or that the Practice has any control whatsoever over what Anthem does with their own website. Furthermore, the plaintiff insists that the Practice is listed on "Anthem Virginia's" website. (Plaintiff's Brief at 4-5.) This is factually inaccurate. The Practice is listed on Anthem's national website, through the actions of companies over which the Practice has no control. This unsolicited action cannot be interpreted as a purposeful effort to solicit business in Virginia. As a result, the plaintiff has failed to prove by a preponderance of the evidence that the Practice's listing is a continuous and systematic action of the defendant intended to solicit business in Virginia.[4]

The plaintiff also asserts that personal jurisdiction is proper over the Practice

---

[4] Additionally, the court notes that placement of a national advertisement, which a listing on Anthem's national website represents, does not by itself amount to "regular solicitation" under the Virginia Code § 8.01-328.1(A)(4). *DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419, 426 (E.D. Va. 1996). Furthermore, the Fourth Circuit has held that "advertising and solicitation activities alone do not constitute the 'minimum contacts' required for general jurisdiction." *Nicholas v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993).

-40-

based on numerous other grounds, many of which are factually inaccurate or irrelevant. In response, the court notes that the evidence in this case demonstrates that the Practice does not advertise for patients in Virginia. While the Practice is listed in a telephone book that serves both Virginia and Tennessee, it is clear that the Practice did not solicit this listing and has not paid for this listing. In fact, there has been no listing or solicitation of business in Virginia of any sort initiated by the Practice in the last 15 years.

Additionally, the fact that the Practice has a contract with a Virginia company, PIM, to service its computer system in Tennessee cannot establish personal jurisdiction over the Practice in this case. While the computers at issue are used for the Practice's billing, this contact with Virginia is *de minimus*. *See Wolf*, 745 F.2d 911. In *Wolf*, the Fourth Circuit found that the defendant hospital had a contract with a forum-state entity to provide laundry services, which was entirely unrelated to the cause of action. *See Wolf*, 745 F.2d 911. The court held that this contact was *"de minimus"* and that it had no bearing on the jurisdictional analysis. *Wolf*, 745 F.2d 911. Likewise, the Practice's computer service contract is *de minimus* in this case because this cause of action has nothing to do with the computer contract or the Practice's billing procedures and practices.

Therefore, this court finds that personal jurisdiction is proper over the Practice based solely on the Practice's contacts with the Commonwealth of Virginia created by Dr. Loria's treatment of patients in Virginia.

-41-

## IV. Proposed Findings of Fact

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations.

1.  By agreement of the parties, evidence and written argument were submitted in this case in lieu of a live evidentiary hearing;

2.  Thus, the court is proceeding as if a formal evidentiary hearing were held by deciding the Motions based on the evidentiary hearing standard that the plaintiff has the burden to prove personal jurisdiction by a preponderance of the evidence;

3.  Personal jurisdiction in a federal diversity jurisdiction case requires a two-part test;

4.  First, the court must determine whether Virginia law authorizes jurisdiction and, if Virginia law does authorize jurisdiction, the court must then determine whether the exercise of jurisdiction complies with federal constitutional standards of due process;

5.  The plaintiff is proceeding under Virginia Code § 8.01-328.1(A)(4), which requires the plaintiff to prove that the defendant (1) regularly conducts or solicits business in Virginia; (2) engages in any other persistent course of conduct in Virginia; or (3) derives substantial revenue from goods used, goods consumed or services rendered in Virginia;

6.  There are two types of federal personal jurisdiction: specific jurisdiction, which arises when the basis of the suit arises from the defendant's contacts with the forum state, and general jurisdiction, which arises when the defendants' contacts with the forum state do not form the basis of the suit;

7.  Because none of the potential jurisdictional contacts attributable to either Dr. Green or the Practice in Virginia are related to the cause of action in this case, the plaintiff cannot establish specific jurisdiction;

8.  The jurisdictional contacts of each distinct defendant, Dr. Green and the Practice, must be evaluated separately and the contacts of the corporation cannot be imputed to its employee, Dr. Green;

9.  Dr. Green's only relevant contact with the Commonwealth of Virginia is that he has a Virginia Medicaid number that was applied for in the 1980s;

10. The plaintiff failed to establish that this singular contact proved that Dr. Green regularly conducted or solicited business in Virginia, that he engaged in any

-42-

other persistent course of conduct in Virginia or that he derived substantial revenue for services rendered in Virginia;

11.    As a result, the plaintiff failed to establish personal jurisdiction over Dr. Green by a preponderance of the evidence;

12.    The Practice employs a Virginia-licensed physician, Dr. Loria, who has treated three patients in Virginia for approximately two years on a fairly regular basis for the benefit of the Practice;

13.    Dr. Loria's actions on behalf of the Practice satisfy Virginia Code § 8.01-328.1(A)(4), because they amount to the Practice regularly conducting business in Virginia and the Practice engaging in a persistent course of conduct in Virginia;

14.    Dr. Loria's actions also amount to "continuous and systematic" contacts on behalf of the Practice with the Commonwealth of Virginia; thus, general personal jurisdiction over the Practice complies with federal constitutional standards of due process;

15.    As a result, the plaintiff has established by a preponderance of the evidence that personal jurisdiction is proper over the Practice.

## V. Recommended Disposition

Based on the above-stated reasons, I recommend that the motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule 12(b)(2), (Docket Item Nos. 3 and 21), be **GRANTED** with respect to Dr. Green. I further recommend that the defendants' motion to dismiss with respect to the Practice, (Docket Item No. 21), be **DENIED**.

## VI. Notice To Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

-43-

Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in the matter to the Honorable Glen M. Williams, Senior United States District Judge.

The clerk is directed to send copies of this Report and Recommendation to all counsel of record.

**DATED:** This 8th day of June, 2007.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-44-